**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**George C. HOOK, Defendant–Appellant.**

No. 98–2420.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 30, 1998.

Decided Oct. 21, 1999.

Rehearing and Rehearing En Banc
Denied Dec. 13, 1999.

Bradley W. Murphy (argued), Office of U.S.Atty., Peoria IL, for Plaintiff-Appellee.

Dolores M. Veninga (argued), Chicago, IL, for Defendant-Appellant.

George C. Hook, pro se.

Before FLAUM, KANNE and EVANS, Circuit Judges.

KANNE, Circuit Judge.

George C. Hook is a failed attorney who wagered his practice on a series of illegal transactions designed to support a struggling manufacturer, Wittek Industries, Inc. He lost the gamble because, on the basis of these transactions, a jury found Hook guilty of three counts of wire fraud, 18 U.S.C. § 1343, one count of theft from an employee benefit plan, 18 U.S.C. § 664, and three counts of money laundering, 18 U.S.C. § 1956. On appeal, Hook raises more than a score of grounds for reversal. We will directly address only two: (1) whether prosecution is precluded because an essential element of the theft count has been estopped; and (2) whether the cumulative effect of the district court's eviden-

tiary rulings denied Hook the right to present a defense.

## I. HISTORY

In 1990, Carmen Viana acquired Wittek Industries, Inc. ("Wittek"), assuming the positions of CEO and sole director. Wittek manufactured door rods and hose clamps for the automotive industry with facilities located in Chicago, LaGrange Park, Illinois and Pineville, North Carolina. Despite contracts with Chrysler Corporation and Ford Motor Company, Wittek experienced financial difficulties.

In 1989, Chrysler purchased $13,000,000 of Wittek debt from a creditor in order to alleviate some of these difficulties. The cash flow problems at Wittek continued until Wittek closed its Illinois plants in 1991 and sold the assets at its Pineville plant (retaining only the plant location, which also was deactivated), intending to consolidate its manufacturing operations at one facility in Galesburg, Illinois. However, the move ran over budget, and Chrysler was forced to extinguish much of the outstanding debt to ensure a continued supply of door rods. Wittek's problems were complicated further when Viana unilaterally terminated Wittek's contract with Ford, reducing Wittek's income by 40 percent.

In the effort to consolidate Wittek, Viana hired independent advisor Sam Lillie to close out many of the sixteen existing pension and profit-sharing plans related to Wittek. About this time, Lillie informed Viana that one of these plans, "the Retirement Plan for United Steel Workers, Local 6141, Employees of E.C. Manufacturing Division, Wittek Industries, Inc." (the "6141 Plan"), was underfunded and that Wittek's contributions to this plan were delinquent. In an attempt to cure these problems, Viana authorized Lillie to negotiate annuities for many retired plan members. Even these efforts were complicated by Wittek's cash flow shortfall and by a lawsuit filed by former employees of the Pineville plant who sought vacation and severance pay due as a result of the Pineville plant closure. These claims resulted in liens being placed on the Pineville property. With Wittek in this financial condition, Viana contacted defendant George C. Hook.

Viana met Hook on June 6, 1992, in Galesburg, Illinois, at a social gathering held at Knox College. Viana asked Hook, an attorney whose professional corporation was a general partner in the Chicago law firm of McBride, Baker, and Coles ("McBride"), for legal advice on a number of pending lawsuits and for specialized advice on retirement plans. Shortly thereafter Hook arranged to meet with Viana and Drake Boutwell, a former McBride attorney who specialized in the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. (1994). Viana approached Boutwell with the idea of removing funds from the 6141 Plan to fund Wittek through a sale of Wittek assets to the plan. Boutwell informed Hook and Viana that Wittek could not legally receive funds from such a sale but that the 6141 Plan's underfunding could be reduced through the use of a real estate operating corporation. Following the meeting, Boutwell provided Viana and Hook with a written memorandum detailing the proposed transaction, which Hook personally read and edited. This memorandum explicitly informed Hook and Viana that no funds from the 6141 Plan could flow, directly or indirectly, into Wittek.

Boutwell advocated the creation of a real estate operating corporation whose equity would be held by the 6141 Plan in majority and Viana in minority. This corporation would be able to borrow from the 6141 Plan, and the corporation would use these borrowed funds to purchase, sell, develop, maintain or lease real property. Viana and Hook soon implemented these plans, incorporating the Pineville Real Estate Operating Corporation ("PREOC") in North Carolina on July 7, 1992. Immediately following incorporation, Hook prepared a deed evidencing a transfer of Wit-

tek's Pineville property to PREOC and a mortgage in the amount of $600,000 from PREOC to the 6141 Plan.

Hook and Viana's plans to borrow money from the 6141 Plan were initially complicated by the plan's custodian, Manufacturer's Bank of Detroit, Michigan. To appease the custodian, Drake Boutwell drafted a document shifting trusteeship of the 6141 Plan from Wittek directly to Viana in her personal capacity. Manufacturer's Bank also demanded a client trust account number for PREOC and an opinion letter that affirmed the legality of the transfers. Hook provided the account number of a McBride trust account at Harris Bank Glencoe–Northbrook ("HBGN") and Boutwell provided an opinion letter which stated that the transaction was legal since none of the funds would inure to the benefit of Wittek. At the direction of Viana, Manufacturer's Bank wired $36,855.87 to the McBride account at HBGN.

When John Ronald ("Ronald") of Manufacturer's Bank determined that the funds had not been deposited in a plan trust account, he demanded that Hook return the funds. Instead, Hook wired the funds to Wittek, where the funds were used for operating expenses. On July 24, 1992, Hook opened a checking account for PREOC at HBGN. However, before Manufacturer's Bank would wire additional funds from the 6141 Plan, it demanded evidence of a fidelity bond. McBride attorney Robert Block, at Hook's direction, sent Manufacturer's Bank a copy of a fidelity bond that met all ERISA requirements. Additionally, Manufacturer's Bank demanded that Viana be replaced as trustee by an institutional trustee. In response, Hook drafted a document for HBGN that purported to accept its trusteeship and provide a plan account number. This document was signed by HBGN employee Marcia Schneider, at the request of Hook, after he assured her that "everything would be okay." However, HBGN never assumed trust powers, and the plan account number was actually the account number for PREOC's checking account. This document was sent on July 30, 1992, to Manufacturer's Bank, which in response began to wire 6141 Plan money to HBGN.

On July 31, Manufacturer's Bank wired $323,750 to HBGN. Hook used $300,000 of these funds to purchase a certificate of deposit in the name of PREOC. This certificate of deposit was subsequently pledged as collateral for a $300,000 loan made to PREOC by HBGN. The proceeds of this loan soon arrived in Wittek's bank account at Continental Bank, Chicago. On August 7, Manufacturer's Bank wired an additional $628,750 to the PREOC account at HBGN. These funds were used to purchase two certificates of deposit: the first in the name of PREOC for $260,000; the second in the name of the 6141 Plan for $367,250. The PREOC CD was soon pledged as collateral for a loan of equal value from HBGN. The proceeds of the second loan were deposited in Wittek's bank account at Harris Bank, Barrington, Illinois. On September 18, $100,000 was moved from the 6141 Plan CD to the PREOC checking account, used to purchase another CD and pledged as collateral for an additional loan. The proceeds of this loan were wired to the Wittek account at Harris Bank, Barrington. In return for these withdrawals, Hook prepared a note in the amount of $600,000 from PREOC, which was given on July 7, 1992, to the 6141 Plan. This note was secured by a mortgage on the Pineville property, subordinate to the mortgage that the 6141 Plan held already on the property.

By this time, Manufacturer's Bank had alerted the Department of Labor ("DOL") to Hook and Viana's activities, and an investigation was underway. Under heightened scrutiny and the continued strain of Wittek's unprofitability, the scheme began to crumble. Hook had failed to record the July deed and mortgage which protected the 6141 Plan's mortgage to PREOC. When the Pineville employees later filed a judgment lien, much of the value of the

mortgage was diminished. Hook initially refused to divulge the details of the scheme to his partners or to DOL, asserting that $600,000 of the Plan was invested in PREOC, but withholding the September investment of an additional $100,000. He claimed that Viana was trustee, rather than HBGN, and he denied that any funds had been channeled through the McBride account. Eventually, Hook was forced to admit that the purpose of the HBGN loans was to distance Wittek from the receipt of the 6141 Plan's assets and that the document purporting to make HBGN a trustee had been devised in order to induce Manufacturer's Bank to wire the 6141 Plan's funds. PREOC eventually defaulted on its HBGN loans. In January 1993, HBGN recovered the CDs pledged as collateral. PREOC could not repay its loan to the 6141 Plan, and Wittek became insolvent. Finally, Carmen Viana fled the country.

In an attempt to salvage the 6141 Plan, the Pension Benefit Guaranty Corporation ("PBGC"), a wholly government-owned corporation, intervened and filed an action in North Carolina to become plan trustee, in March 1995. In *Pension Benefit Guaranty Corp. v. Wittek*, No. 95CV117MCK (W.D.N.C.1995) (*"P.B.G.C.v.Wittek"*), the United States District Court for the Western District of North Carolina issued an order that named the PBGC trustee and set the termination date for the plan at February 13, 1991. PBGC began to repay benefits to 6141 Plan members, using a judicially determined termination date for the plan of February 13, 1991, to calculate benefits accrued.

In February, 1995, DOL, in conjunction with the Internal Revenue Service, had procured enough information to obtain an indictment against Hook and Viana from the United States District Court for the Central District of Illinois for wire fraud, theft from an employee-benefit plan and money laundering. In response to this indictment, defendant Hook[1] filed several motions, including a motion to transfer, a motion on the particular statements of the indictment and a motion to dismiss for failure to state a claim. When Judge Joe B. McDade denied these motions, Defendant filed a motion to disqualify him. This motion was denied, so Defendant filed a mandamus action, which we denied in *Hook v. McDade*, 89 F.3d 350, 357 (7th Cir.1996). Defendant sought certiorari to the United States Supreme Court on the mandamus action, but this petition was denied. During this time, a superseding indictment was returned against defendants Hook and Viana, charging wire fraud, theft from an employee-benefit plan and money laundering. Judge McDade recused himself, and the case was transferred to Judge Michael M. Mihm.

Defendant filed numerous pre-trial motions with Judge Mihm, but these motions were denied. During this time, the government filed a motion in limine requesting that testimony by certain of Defendant's legal experts be barred. This motion was granted, and Defendant filed an additional mandamus action, seeking to stay trial. We denied mandamus by order No. 97–2054 (7th Cir.1997). At trial, the government presented McBride attorneys, Wittek employees, HBGN employees and Manufacturer's Bank employees. Hook presented expert witness Albert L. Grasso, a legal expert on ERISA matters, but the district court limited his testimony upon the government's objection, on the grounds that the testimony was misleading, unhelpful and inaccurate as a matter of law. Hook also attempted to enter evidence that HBGN was full trustee to the 6141 Plan, but the district court would not admit this evidence because of lack of authentication. On May 29, 1997, the jury found Defendant guilty on three counts of wire fraud, 18 U.S.C. § 1343, one count of theft from an em-

---

1. Carmen Viana has fled the jurisdiction, and she has not been served or tried. All references to "Defendant" will, thus, refer to de- fendant George C. Hook, while all references to Carmen Viana will so specify.

ployee-benefit plan, 18 U.S.C. § 664, and three counts of money laundering, 18 U.S.C. § 1956.

Hook then filed a motion for a new trial, based upon the government's failure to disclose information on the 1997 civil settlement between PBGC, Harris Bank and McBride. After further discovery and evidentiary hearings, the district court denied Defendant's motion, on the ground that the failure to disclose negotiations would not have materially affected the outcome of the jury trial. We rejected a motion for mandamus by order No. 98–118 (7th Cir. 1998). On May 26, 1998, Defendant faced sentencing. Despite a base offense level and specific offender characteristics that resulted in an offense level of 24 under U.S.S.G. § 2S1.1(a)(2) and § 2S1.1(b)(2), the district court enhanced Defendant's offense level to 28 based upon his use of special skill and his obstruction of justice. The district court imposed a concurrent sentence of eighty-four months on each wire fraud count and on each money laundering count, as well as a concurrent sixty month sentence on the count of theft from an employee-benefit plan and an order to pay restitution to the PBGC in the amount of $735,566.

## II. ANALYSIS

Defendant raises twenty-one issues on appeal. Due to the fragmentary nature of many of these arguments and the lack of legal development given to these arguments in Defendant's appellate briefs, we will not directly address all issues. Instead, we will focus on the two primary arguments that Defendant has advanced in his briefs and at oral argument: (1) that prosecution has been precluded by judicial estoppel based on the ruling by the United States District Court for the Western District of North Carolina in *P.B.G.C. v. Wittek*, No. 3:95CV117–MCK (1995), that the 6141 Plan was terminated on February 13, 1991; and (2) that the district court's grant of the government's motion in limine and

evidentiary rulings at trial prevented Defendant from effectively raising a defense.

Defendant Hook's contention that prosecution has been precluded by judicial estoppel is a question of law, which we review *de novo*. *See United States v. Salerno*, 108 F.3d 730, 740 (7th Cir.1997); *United States v. Bailin*, 977 F.2d 270, 281 (7th Cir.1992). To the extent that we reconsider the district court's determination that 18 U.S.C. § 664 does not apply to a plan which has been retroactively terminated by a later judicial decision, we again review a question of law *de novo*. *See United States v. Gentile*, 816 F.2d 1157, 1161 (7th Cir.1987) (citing *Petrucelli v. Coombe*, 735 F.2d 684, 690 (2d Cir.1984)). We review the claim that the district court's rulings constitute constitutional error *de novo*. *See Milone v. Camp*, 22 F.3d 693, 699 (7th Cir.1994). However, these rulings constitute a fundamental constitutional error only if they are made wrongfully, and we review the individual district court ruling granting of motion in limine and its other evidentiary rulings for evidence of abuse of discretion. *See White v. United States*, 148 F.3d 787, 791 (7th Cir. 1998); *Vance v. Peters*, 97 F.3d 987, 995 (7th Cir.1996); *Jackson v. Bunge Corp.*, 40 F.3d 239, 246 (7th Cir.1994). The relevant inquiry for abuse of discretion is, "not how the reviewing judges would have ruled if they had been considering the case in the first place, but rather, whether *any* reasonable person could agree with the district court." *Jackson*, 40 F.3d at 246 (citation and internal quotation marks omitted).

### A. Preclusion of Prosecution

Appellant's primary argument rests on the claim of prosecutorial preclusion. According to this theory, the government should have been estopped from prosecuting Hook under 18 U.S.C. § 664 because of the judgment it sought in *P.B.G.C. v. Wittek Industries*, No. 3:95CV117MCK at 2, which retroactively set the termination date for the 6141 Plan at February 13, 1991, before Defendant's

conduct occurred. Defendant contends that the conviction under § 664 was predicate to the other six counts of his conviction, the three counts of wire fraud and the three counts of money laundering. Therefore, estoppel on § 664 bars prosecution on the entire superseding indictment. Defendant's contention rests on two propositions of law: 1) the order of the district court in *P.B.G.C. v. Wittek* should have judicially estopped the prosecution of the § 664 claim; or 2) the retroactive termination of the 6141 Plan precludes the proof of an essential element of the § 664 claim. We disagree with both propositions.

### 1. Judicial Estoppel

▪▪▪ Defendant contends that the prosecution of the indictment against him should have been precluded because the government is estopped from arguing one position at trial when one of its instrumentalities had previously litigated the opposite position in an earlier action. As such, Defendant's contention is one of judicial estoppel, which "is an equitable concept 'provid[ing] that a party who prevails on one ground in a lawsuit cannot turn around and in another lawsuit repudiate the ground.'" *Ogden Martin Systems of Indianapolis v. Whiting Corp.*, 179 F.3d 523, 526 (7th Cir.1999) (quoting *McNamara v. City of Chicago*, 138 F.3d 1219, 1225 (7th Cir.), cert. denied, —— U.S. ——, 119 S.Ct. 444, 142 L.Ed.2d 398 (1998)). The purpose of judicial estoppel is "to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories." *Levinson v. United States*, 969 F.2d 260, 264 (7th Cir.1992). Although the doctrine has no precise bounds, certain clear prerequisites exist for its application: (1) "the later position must be clearly inconsistent with the earlier position;" (2) "the facts at issue should be the same in both cases;" and (3) "the party to be estopped must have convinced the first court to adopt its position." *Id.* at 264–65.

Here, PBGC successfully convinced the United States District Court for the Western District of North Carolina to adopt a termination date of February 13, 1991, for the 6141 Plan, *P.B.G.C. v. Wittek Industries*, No. 3:95CV117–MCK at 2. Despite the different procedural postures of the two actions, the same operative facts are at issue here as in *P.B.G.C. v. Wittek.* However, Defendant does not argue, and we are not convinced, that the government's present position is inconsistent with its former position.

In *P.B.G.C. v. Wittek*, the government filed an action to name the PBGC as trustee of the 6141 Plan and to terminate the 6141 Plan pursuant to Title IV of the ERISA. *See* 29 U.S.C. §§ 1342(b)-(c). The purpose of such an action is to set a proper date for administrative use, in order that the PBGC, as an insurer of underfunded pension plan participants, may ascertain a proper ending date for benefits and premiums to accrue. *See* 29 U.S.C. § 1342; *Pension Benefit Guaranty Corp. v. Heppenstall Co.*, 633 F.2d 293, 296–97 (3d Cir.1980). The purpose of setting such a termination date is "in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund." 29 U.S.C. § 1342(c).

Defendant Hook advances the argument that, because the government succeeded in establishing a termination date in 1995 for the 6141 Plan at February 13, 1991, it must be estopped from arguing that Defendant stole from an ERISA plan, an essential element of the § 664 offense. To accept this reasoning, we first must accept Defendant's mindbending logic that a retroactive termination designed to establish the level of benefits for defrauded plan members should decriminalize the conduct of the parties who have substantially aggravated the deterioration of the plan. In addition, we must accept that the government's positions are "clearly inconsistent." They are not. The action to set a termi-

nation date for an involuntary termination serves an administrative purpose—to establish a date when benefits and premiums cease to accrue. The government's current position, that the plan was an ERISA plan at the time that Defendant defrauded it, is not affected by the establishment of a date to set benefits. To argue otherwise would be antithetical to the statutory purpose of § 1342, which is to guarantee plan members their due benefits. Since the positions taken by the government are not clearly inconsistent, the district court did not err in permitting the government to prosecute Hook's indictment.

*2. Retroactive Termination Date Precludes Prosecution Under 18 U.S.C. § 664*

■ Even if his prosecution was not precluded by judicial estoppel as he asserts, Defendant still argues that the essential elements of the § 664 claim were not proven. Defendant's argument rests upon the premise that the determination of a plan termination date as of February 13, 1991, terminated the 6141 Plan, which removed an essential element from the § 664 claim. Because we find that establishment of a retroactive termination date does not decriminalize a defendant's conduct subsequent to that date, we reject Defendant's argument.

■ Section 664 criminalizes the conduct of "[a]ny person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan...." 18 U.S.C. § 664. An employee welfare benefit plan is defined as "any employee benefit plan subject to *any* provision of title I of [ERISA]." 18 U.S.C. § 664 (emphasis added). To violate § 664, a defendant must steal from an employee-benefit plan, for there is "no indication that § 664 was intended to apply to any funds other than those governed by ERISA." *United States v. Bell*, 22 F.3d

274, 276 (11th Cir.1994). A terminated plan is no longer subject to any provision of Title I of ERISA, *see Trippet v. Smith*, 592 F.2d 1112, 1113 (10th Cir.1979), however, an employee-benefit plan may not be terminated except by the procedure outlined in 29 U.S.C. § 1341. *Phillips v. Bebber*, 914 F.2d 31, 34 (4th Cir.1990). Until an employee-benefit plan has been terminated, the duties and protections of Title I continue to apply to the plan. *See Waller v. Blue Cross of California*, 32 F.3d 1337, 1343 (9th Cir.1994); *see also Martin v. Lundberg*, No. CA3–88–2470D, 1991 WL 85892 (W.D.Tex.1991) (applying Title I fiduciary standards to plan undergoing termination). The applicability of Title I fiduciary and criminal protections to a terminating ERISA plan is a question of first impression in this circuit.

Defendant contends that an essential element of the theft claim cannot be proved because of the ambiguity of the procedures for terminating an ERISA plan. When a plan is involuntarily terminated, and the trustee and plan administrator cannot agree on a termination date for the plan, the court must determine a termination date. *See* 29 U.S.C. §§ 1348(a)(4), (b)(2). Since the judicial process and the process of involuntary termination both take time to complete, a judge often must set a retroactive termination date to ensure that plan members and the corpus of the plan both receive equitable treatment. After the establishment of a retroactive termination date, the plan during the time between the termination date and the effective liquidation of the plan exists in legal limbo where "termination" has occurred but liquidation has not.

Defendant would exploit this ambiguity by suggesting that the establishment of a termination date retroactively terminates the plan and ends the applicability of Title I of ERISA, including the applicability of § 664, to the 6141 Plan. However, as we have stated before, the mere establishment of a termination date does not terminate an employee-benefit plan. A plan can only

be terminated in the manner prescribed by 29 U.S.C. § 1341, a process which undisputedly continued until at least 1995 when PBGC was appointed trustee of the 6141 Plan. We hold that, during the period between the termination date and the final liquidation of the 6141 Plan, the plan was legally within the process of termination. As such, the fiduciary and criminal standards of Title I continue to apply to the Plan. To hold that § 664 would become inactive whenever a retroactive termination date has been set would frustrate the purpose of § 664, which is to protect the employee-benefit plan members from having their assets embezzled, by allowing thieves to convert all of the money from a plan merely by laying off plan members before stealing their accrued benefits. By setting a retroactive termination date, a district court does not remove Title I protections from an employee-benefit plan; the district court merely sets an administrative point of reference that will allow the plan administrator and trustee to compute accrued benefits and premiums.

The prosecution of Hook should not have been precluded by judicial estoppel, nor should the establishment of a retroactive termination date have forced, as a matter of law, the conclusion that an essential element of § 664 had not been proved on the district court. Defendant bases his challenge to his convictions on the remaining counts in his indictment on the basis that these claims depended in their essential elements upon the theft count. Since we have found that the prosecution of the § 664 count was without error, we need not reach the question whether the wire fraud and money laundering counts factually depended on the § 664 count.

## B.  Denial of the Estoppel Defense

Next, Defendant argues that he was unable to present certain affirmative defenses as a result of numerous rulings made by the district court. The cumulative effect of these rulings, according to Defendant, constitutes constitutional error, which must be overruled regardless of the propriety of the individual rulings. In support of this theory, Defendant cites the syllabus to *Arizona v. Fulminante*, 499 U.S. 279, 280–81, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), which alludes to the legal doctrine dictating that due process is violated despite overwhelming evidence in support of a conviction when certain types of constitutional errors occur. We do not grant precedential authority to the syllabus of a Supreme Court decision. Defendant also cites *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), in support of the position that the failure to allow one to present one's defense is such a constitutional error.

In *Chambers*, however, the Supreme Court noted that the right to present one's defense is conditioned upon "the accused ... comply[ing] with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* This caveat overcomes Defendant's argument since, to determine if a defendant has complied with established rules of evidence, the district court must have the ability to rule independently on each article of evidence. Assuming *arguendo* that denial of a defense by cumulative evidentiary rulings can constitute such a structural constitutional error, Defendant must show that, in each instance, the district court has abused its discretion in refusing to accept relevant evidence before determining that a due process violation has occurred. Defendant contests three evidentiary rulings: (1) the grant of the government's motion in limine; (2) the limitation of Defendant's expert's testimony; and (3) the exclusion of evidence regarding HBGN's trust powers. We find that none of these rulings constitute an abuse of the trial court's discretion.

### 1.  Motion in Limine

The district court granted the government's motion in limine, which

sought to preclude Defendant from presenting the argument that the 6141 Plan was not subject to Title I of ERISA under the decision in *P.B.G.C. v. Wittek*, because it found that Defendant's conclusions were wrong as a matter of law and presenting such a meritless argument would prove substantially more prejudicial than probative. Although a "trial court's balancing of probative value and unfair prejudice is highly discretionary and its decision on admissibility will be accorded with 'great deference,'" *West v. Love*, 776 F.2d 170, 174 (7th Cir.1985), we will reverse if the trial court bases exclusion on an erroneous legal conclusion. *See Finchum v. Ford Motor Co.*, 57 F.3d 526, 530 (7th Cir.1995). Defendant's argument was based on the legal conclusion that a retroactive establishment of a termination date for an ERISA plan terminates the applicability of Title I of ERISA to that plan. As we have discussed, the district court correctly determined that this legal conclusion was in error. Lacking any error in law, we decline to reconsider the district court's determination of prejudice and conclude that the district court did not abuse its discretion in granting the government's motion in limine.

### 2. *Defendant's Expert Witness Testimony*

▮ The district court limited the expert testimony of Defendant's ERISA expert, Albert L. Grasso, on the ground that Grasso's conclusions were "inaccurate as a matter of law ... inherently misleading, not reasonably tied to the facts in evidence, and [the testimony] would not assist the Jury's understanding of the case." (R. 181). Grasso's omitted testimony related to his opinion that the 6141 Plan was no longer an ERISA plan since the employees were no longer employees within the meaning of ERISA as a result of the 1991 closure of the Pineville plant. As we stated above, the district court correctly ruled that this opinion was inaccurate as a matter of law. We refuse to reconsider the district court's determination of prejudice

and find that the district court did not abuse its discretion in limiting Grasso's testimony.

### 3. *HBGN Trust Powers*

▮ Defendant wished to argue at trial that no wire fraud occurred because HBGN had full trust powers when the wire transfers at issue were made. Defendant supported his claim that HBGN had full trust powers with a statement made by Dean Miller, Senior Advisor to the Comptroller of Currency, who based his conclusions on a computer entry that indicated HBGN to have trust powers. Miller advised Defendant, however, that he would have to examine off-site records in order to verify the information. Instead of waiting for the information to be verified, Defendant sought to introduce the statement as evidence that HBGN had full trust powers. The district court reserved its ruling until the evidence could be verified. When the official file was obtained, the record showed no evidence to support the computer entry. In light of the official record and the testimony of HBGN witnesses who refused to allow the bank to act as trustee for the 6141 Plan, the district court refused to admit Defendant's copy of the computer record as evidence of a public record. On review, Defendant presents no explanation why this computer printout should have been admitted, and although we do not demand a formal offer of proof, the record must present some equivalent explanation of admissibility. *United States v. Cleggett*, 179 F.3d 1051, 1055 (7th Cir.1999). Our review of the record has led us to determine that Defendant never provided a sufficient argument for the admission of the evidence in the face of the contradictory evidence. For this reason, we find that the district court did not abuse its discretion in excluding evidence of HBGN's full trust powers.

### C. *Defendant's Other Arguments*

▮ The remaining issues that Defendant presents on appeal lack any de-

gree of development in his briefs and thus merit only our briefest attention. A party's failure to address or develop a claim in its opening brief constitutes a waiver of that claim, for "[i]t is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel . . ." *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 668 (7th Cir.1998), (citing *Sere v. Bd. of Trustees of the Univ. of Ill.*, 852 F.2d 285, 287 (7th Cir.1988)). In order to develop a legal argument effectively, the facts at issue must be bolstered by relevant legal authority; a perfunctory and undeveloped assertion is inadequate to raise a separate basis for appeal. *See Indurante v. Local 705, Int'l Bhd. of Teamsters*, 160 F.3d 364, 366 (7th Cir.1998).

■ Defendant argues that a new trial is warranted by Judge Mihm's failure to rule properly on Defendant's motion for a new trial and his motions for post-trial evidentiary hearings. However, we decided these same issues on petition for mandamus by order in No. 98–118 (7th Cir. 1998), and Defendant has not presented any reasons why we should reconsider this order. These arguments now have been waived. Defendant also argues that the district court made a constitutional error by refusing to submit Defendant's jury instructions. However, Defendant does not address in his briefs why the jury instructions that were presented were so inadequate as to constitute a violation of due process, so this argument has been waived. *See United States v. Cusimano*, 148 F.3d 824, 828 (7th Cir.1998); *Pitsonbarger v. Gramley*, 141 F.3d 728, 739–40 (7th Cir.1998)

■ Defendant contends that the denial of a motion for discovery for both grand juries that indicted him constituted a reversible error, which would taint both indictments and all subsequent proceedings. Hook presents only broad language of "particularized need" to demonstrate the error of the district court's rulings, and this language has not been supplemented by any relevant authority. This argument also has been waived by lack of development. *See Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir.1986) (failure to cite relevant authority constitutes a waiver). Hook makes similar broadly stated and unsupported arguments regarding the sufficiency of evidence presented at trial, allegations of prosecutorial misconduct, arguments against the denial of motions for change of venue and to transfer and arguments against the propriety of sentencing. None of these arguments have been presented in Defendant's briefs with sufficient specificity or reference to relevant authority to survive minimal scrutiny; as such, all of these arguments have been waived by lack of development. *See Pitsonbarger*, 141 F.3d at 738.

■ Finally, Defendant argues that the indictment violates the Sixth Amendment because it fails to state a crime. The indictment supposedly fails to state a crime because Congress has no constitutional authority to enact federal crimes outside of counterfeit, piracy and crimes committed by members of the militia. Defendant's argument ignores Article I, Section 8, of the United States Constitution, the Commerce Clause, as a source of legislative authority. Section 1956 of the U.S.Code, Title 18, is a valid extension of congressional power, *see United States v. Peay*, 972 F.2d 71, 74 (4th Cir.1992), and both § 1343 and § 664 are within the extensive reach of the Commerce Clause. Therefore, we also reject this argument.

## III. CONCLUSION

Because we find that the prosecution of Defendant based upon § 664 was not precluded by the ruling of the District Court in *P.B.G.C. v. Wittek*, because we find that the district court did not abuse its discretion in its evidentiary rulings and because we find that Defendant has asserted either baseless or legally undeveloped arguments

on the remaining issues he advances, the judgment of the district court is AFFIRMED.