IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 18, 2009

Charles R. Fulbruge III
Clerk

No. 08-10126

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

WILLIAM B. WOFFORD

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before SMITH, SOUTHWICK, Circuit Judges and RODRIGUEZ[1], District
Judge.

XAVIER RODRIGUEZ, District Judge:

A jury found Defendant-Appellant William B. Wofford guilty of theft from
an employee benefit plan in violation of 18 U.S.C. § 664. Section 664 requires
that a person embezzle, steal, abstract, or convert funds from an employee
benefit plan that is subject to any provision of Title I of the Employee
Retirement Income Security Act of 1974 ("ERISA"). Wofford challenges the
district court's exclusion of his proposed expert's testimony regarding whether
the plan was tax qualified and thus subject to Title I of ERISA and the district

---

[1] District Judge of the Western District of Texas, sitting by designation.

court's inclusion of a jury instruction that a qualified plan that later loses tax qualified status remains subject to Title I of ERISA, arguing that these actions denied him his right to a jury determination on whether the plan was subject to any provision of Title I. Wofford also challenges the district court's inclusion of a deliberate ignorance instruction on the basis that its submission was not supported by the evidence. Finding no error, we affirm.

## I.

On April 25, 2007, a grand jury returned a ten-count superseding indictment charging Wofford with embezzlement from an employee benefit plan, in violation of 18 U.S.C. § 664. The indictment stated that Premier Consulting, owned by Wofford, was an employee leasing company, that one of the benefits it provided to its employees was a 401(k) retirement benefit plan, known as the "Premier Employer's Group 401(K) Plan," and that the Plan was an "employee pension benefit plan" subject to Title I of ERISA. Wofford was the Plan Trustee and a fiduciary.

According to the indictment, paragraph 9.6 of the Plan contained a "Prohibition Against Diversion of Funds" that prohibited "any part of the corpus or income of any trust fund maintained pursuant to the Plan or any funds contributed therefore to be used for, or diverted to, purposes other than the exclusive benefit of Participants, Retired Participants, or their Beneficiaries." Further, the indictment stated that certain provisions of ERISA also prohibited self dealing by a Plan Trustee and fiduciary such as Wofford, specifically listing 29 U.S.C. §§ 1104 and 1106 as forbidding Wofford "from directly and indirectly borrowing money from the Plan and from causing any company that he owned and controlled from borrowing money from the Plan."

The indictment asserted that, "[n]otwithstanding these provisions of the Plan agreement and of ERISA, in the 18 month period between on or about April 28, 2003 and on or about October 6, 2004, Wofford directly and indirectly

borrowed, withdrew and used, for his own use and benefit and for the use and benefit of companies and entities in which he had a financial interest, those monies, funds and assets of the Plan described in Counts One through Ten of this indictment, in violation of the Plan agreement and in violation of ERISA." The indictment then charged that "[o]n or about each of the dates set forth in Counts One through Ten ..., William B. Wofford, with fraudulent intent, did embezzle, steal and unlawfully and willfully abstract and convert to his own use and the use of another, in the approximate amounts shown in each Count ..., the moneys, funds, securities, premiums, credits, property and other assets of the Premier Employer's Group 401(k) Plan, an employee pension benefit plan that was subject to Title I of the Employee Retirement Income Security Act of 1974, and of a fund connected with said Plan, by withdrawing and causing to be withdrawn from the A.G. Edwards account holding the funds and assets of said employee pension benefit plan the funds represented by the checks described in each Count."

Before trial, the district court granted the Government's First Amended Motion to Strike Wofford's Designation of Expert Witness, precluding Wofford from proffering an expert witness, David Ralston. The Government asserted that the expert's proposed testimony was irrelevant and should be excluded under Rules of Evidence 401, 402, and 403. The district court concluded that Ralston planned to testify that the Plan was not tax qualified, and found this testimony irrelevant because "an employee plan is still governed by ERISA whether or not it is tax qualified."

The evidence at trial was largely undisputed. The Plan was established in 1995 and amended in 1997. The Plan was administered by third-party administrators until March 2002, when the Plan assets were converted to cash and Plan administration was turned over to Premier. At the time of the transfer, Wofford had sold Premier Consulting. The Plan's account balance was

$2,009,473.65, and there were 633 individuals with money in the Plan. Wofford was a Plan participant, and his personal balance in the Plan was approximately $52,494 on March 31, 2002. Wofford transferred the Plan funds to an A.G. Edwards money market account.

Around the same time, Wofford wrote letters to the participants informing them that the Pension Company would no longer be the third-party administrator and that the only investment option available would be a money market account. He also gave instructions for participants to receive distributions and rollovers. Many people responded to the letters asking for distributions, and Premier paid them. One witness, Gabe Morris, testified that he received the letter but wanted to keep the money in the money market account. In addition, some of the letters were returned because the addresses were no longer good, and about $596,332 remained in the A.G. Edwards account at the end of February 2003. At that time, Wofford owned Aircraft Supply Company, Inc. ("ASCI"). He established an Employee Stock Ownership Plan ("ESOP") at ASCI. Wofford filed for personal bankruptcy in February 2003. ASCI was also struggling financially, and Wofford began borrowing money from the Plan.

On April 28, 2003, Wofford instructed his assistant, Patricia Dimmitt, to write a check from the A.G. Edwards account for $47,805 payable to "FOBASCI ESOP" (for the benefit of ASCI ESOP). He also had her type up a promissory note from ASCI-ESOP to the Plan for $47,805. In September 2003, again at Wofford's direction, Dimmitt wrote two more checks payable to ASCI ESOP, for $60,000 and $40,000, and also prepared promissory notes for those checks. The $60,000 check contained the notation "loan." In January 2004, Dimmitt also prepared checks for $20,000 and $65,000 payable to ASCI at Wofford's direction. Dimmitt prepared a promissory note for $85,000 for those loans. Dimmitt prepared another check for $80,000 on March 22, 2004, payable to ASCI and

noted it as a "loan." She also prepared a promissory note. On May 26, 2004, Wofford wrote a check for $10,000 to ASCI from the A.G. Edwards account, but he did not prepare a promissory note. On June 7, 2004, Wofford had Dimmitt write another check payable to ASCI in the amount of $55,000 from the A.G. Edwards account, without preparing a promissory note. Shortly after, Wofford wrote another check to ASCI for $100,000. Last, on October 6, 2004, Wofford instructed Dimmit to prepare a $5,000 check payable to Precision Aerospace, a new company Wofford had started. Thus, some loans had promissory notes and some did not.

Wofford initially made interest payments on the loans, but ASCI eventually was sold, and no interest payments were made on the later loans. Four participants in the Plan testified that they never received their money. Glen Swan, an auditor for the U.S. Attorney's office, testified that by February 2005 there was less than $1000 left in the A.G. Edwards Plan account. Swan also testified that Wofford owed approximately $390,000 to the fund at the time of trial. Wofford's summary witness, Dale Hogue, testified that over 300 participants had not received their money, and that their money was "in loans" to ACSI and Precision Aerospace.

The district court charged the jury as follows:

> For you to find the defendant guilty of a violation of [§ 664], you must be convinced that the government has proved each of the following beyond a reasonable doubt:

***First***    That the Premier Employer's Group 401(k) Plan was an employee pension benefit plan within the meaning of the statute subject to the requirements of Title I of the Employee Retirement Income Security Act, also known as ERISA;

    ***Second***    That the defendant, either acting alone or aided and abetted by others, embezzled, stole, abstracted or converted to his own use or to the use of someone else other than the rightful owner any money, funds,

securities, property or other assets of the Premier Employer's Group 401(k) Plan or of any fund connected with such Plan; and

***Third*** That the defendant acted knowingly and willfully or with fraudulent intent.

"EMPLOYEE PENSION BENEFIT PLAN"

In order to satisfy the first element of this offense, the government must prove beyond a reasonable doubt that the Premier Employer's Group 401(k) Plan was an "**employee pension benefit plan**" subject to Title I of the Employee Retirement Income Security Act, also known as ERISA. In this regard, an "**employee pension benefit plan**" subject to Title I of ERISA is:

(1) any plan, fund, or program (with certain exceptions not applicable in this case),
(2) which is established or maintained by an employer or by an employee organization,
(3) that by its express terms or as a result of surrounding circumstances either
> (a) provides retirement income to employees or
> (b) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond.

....

For the Plan to be covered by ERISA, the employer also must be engaged in commerce or any industry or activity affecting commerce. "Commerce" means trade, traffic, commerce, transportation, or communication between any State or any place outside thereof. The term "industry or activity affecting commerce" means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce.

If you find that the Premier Employer's Group 401(k) Plan is an employee benefit plan as I have defined it for you, the first element of the offense is satisfied.

ADDITIONAL INSTRUCTION: FIRST ELEMENT

An "employee pension benefit plan" subject to Title I of ERISA does not cease being subject to the requirements of Title I of ERISA because of the failure of a plan sponsor, administrator, or other fiduciary of the plan to maintain the plan in accordance with applicable laws and regulations. Therefore, a qualified plan that later loses tax qualified status remains subject to Title I of ERISA.

The jury returned a verdict of guilty on all ten counts. On January 22, 2008, Wofford was sentenced to 51 months on each count, to run concurrently. Wofford timely filed a notice of appeal.

## II.

Wofford's first and third issues on appeal relate to whether the Plan was an employee pension benefit plan as defined by § 664. Wofford correctly contends that the Government was required to prove for the first element of the offense that the 401(k) plan at issue was an employee pension benefit plan that was "subject to any provision of Title I of ERISA." Wofford contends that the district court erred in striking his expert, David Ralston, who proposed to testify on this issue, and in including the "additional instruction" on the first element of the charge.

## A.

In his first issue on appeal, Wofford challenges the district court's exclusion of Ralston's testimony. We review the district court's decision to exclude expert testimony under an abuse of discretion standard. *United States v. Dixon*, 413 F.3d 520, 523 (5th Cir. 2005).

Section 664 provides:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 664. Further, section 664 provides that "the term 'any employee welfare benefit plan or employee pension benefit plan' means any employee benefit plan subject to any provision of title I of the Employee Retirement Income Security Act of 1974." *Id.*

It is undisputed that section 664's plain language requires the Government to prove that the funds were embezzled from a plan that was subject to "any provision of Title I" of ERISA or a fund connected therewith. *See, e.g.*, *United States v. Jackson*, 524 F.3d 532, 544 (4th Cir. 2008) (explaining that the elements of a § 664 violation include that the acts of embezzlement or conversion involve moneys, funds, or assets of an ERISA plan), *petition for cert. filed*, 77 U.S.L.W. 3106 (U.S. Aug. 25, 2008) (No. 08-262); *United States v. Helbling*, 209 F.3d 226, 239 (3d Cir. 2000); *United States v. Hook*, 195 F.3d 299, 307 (7th Cir. 1999); *United States v. Furst*, 886 F.2d 558, 565 (3d Cir. 1989) ("It is indisputable that one substantive element of 18 U.S.C. § 664 is that the account from which funds are embezzled must be one of the two types of accounts defined in the statute; if the account is not governed by ERISA, section 664 is inapposite."). "Title I [of ERISA], 29 U.S.C. § 1001 et seq., 'requires administrators of all covered pension plans to file periodic reports with the Secretary of Labor, mandates minimum participation, vesting and funding schedules, establishes standards of fiduciary conduct for plan administrators, and provides for civil and criminal enforcement of the Act.'" *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 6 (2004) (citing *Nachman*

*Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361 n.1 (1980)).[2] Generally, whether a plan is subject to Title I of ERISA is an issue of fact to be decided by the jury, guided by applicable legal principles. *See Helbling*, 209 F.3d at 239. "A plan is subject to ERISA if it fits under 29 U.S.C. § 1003(a), and is not exempted by 29 U.S.C. § 1003(b). Relevant definitions are provided in 29 U.S.C. § 1002." *Id.*

There is no real dispute about whether the Plan when established was an employee pension benefit plan subject to Title I of ERISA. Section 1003(a) provides that, "[e]xcept as provided in subsection (b) or (c) of this section and in sections 1051, 1081, and 1101 of this title, this subchapter shall apply to any employee benefit plan if it is established or maintained– (1) by any employer engaged in commerce or in any industry or activity affecting commerce . . . ." ERISA defines an employee pension benefit plan as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program– (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan." 29 U.S.C. § 1002(2)(A). The evidence indicates that the Plan was an ERISA plan subject to Title I when it was established, and Wofford has not challenged this fact.

---

[2] Title II of ERISA, which is codified in various parts of Title 26 of the United States Code, "amended various [Internal Revenue Code] provisions . . . pertaining to qualification of pension plans for special tax treatment, in order, among other things, to conform to the standards set forth in Title I." *Hendon*, 541 U.S. at 6; *see also Musmeci v. Schwegmann Giant Super Markets, Inc.*, 332 F.3d 339, 345 (5th Cir. 2003).

The dispute centers on whether the Plan ceased being subject to any provision of Title I of ERISA before Wofford began taking the "loans" from the plan account, and whether the exclusion of Ralston's testimony and the inclusion of the "additional instruction" on this issue were proper. Ralston's proposed testimony, as set forth in the memo summarizing his opinions, was to center on the Plan's failure to remain tax qualified under the Internal Revenue Code requirements and the effects of that failure. Specifically, Ralston planned to testify that "[b]ecause [the GUST] amendments were not made to the Plan, the Plan does not meet the requirements of Section 401(a) of the Code and is not a qualified employee pension benefit plan." The response to the amended motion to strike argued that Ralston would testify that the Plan was "out of compliance with the Internal Revenue Code requirements and is not qualified under the Code and ERISA," that "upon the plans [sic] failure to be a qualified plan, it loses its distinction as being an employee benefit plan," and that the Plan was "disqualified prior to the acts alleged in the indictment."

Section 401(a) is part of the Internal Revenue Code, and lists "requirements for qualification." Assuming the Plan failed to satisfy § 401(a)'s requirements for qualification at the relevant times, whether it was nevertheless a plan "subject to any provision of Title I" of ERISA for purposes of § 664 is an issue of first impression in this Circuit. However, we have previously held in the bankruptcy context that a plan's failure to remain tax qualified does not render ERISA's Title I anti-alienation provisions inapplicable. *In re Sewell*, 180 F.3d 707 (5th Cir. 1999). In reaching that conclusion, we relied upon the Seventh Circuit's decision in *In re Baker*, 114 F.3d 636 (7th Cir. 1997).

*In re Baker*, also decided in the bankruptcy context, involved the issue whether "irregular transactions" from a profit-sharing pension plan meant that the funds remaining in the debtor's pension account were unsheltered by ERISA's anti-alienation rule. *Id.* at 638. Baker, the debtor, and his family

operated Bakco Data Inc., and when it encountered financial difficulties, they improperly borrowed money from the plan as working capital for Bakco. *Id.* at 637. The loans were not properly documented, exceeded permissible levels, and were not repaid, but the disbursements did not exceed the borrowers' vested balances and did not compromise other participants' accounts. *Id.* Bakco eventually folded and Baker filed for bankruptcy protection. *Id.* at 638. Baker's creditor sought to have Baker's pension funds included in his estate, but the bankruptcy court refused. *Id.* The district court and the Seventh Circuit Court of Appeals affirmed.

The Seventh Circuit concluded that the anti-alienation provision protected Baker's pension funds despite the "irregular transactions." In reaching its conclusion, the Seventh Circuit considered the Supreme Court's use of the term "ERISA-qualified pension plan" in *Patterson v. Shumate*, 504 U.S. 753 (1992), noting that the term "ERISA-qualified" does not appear in the statute. *Baker*, 114 F.3d at 638. The court reasoned that "[s]ome plans are *tax*-qualified, a term of art meaning that contributions to the plan are deductible at the corporate level and not taxed to the employee until the plan distributes benefits," but noted that "[t]axation has nothing to do with the question at hand." *Id.* (emphasis in original). The Seventh Circuit concluded that, "[m]ost likely, the Court used 'ERISA-qualified' to mean 'covered by Subchapter I of ERISA." *Id.* Because "Subchapter I of ERISA covers every 'employee benefit plan' established by an employer engaged in interstate commerce, with five exceptions" that did not apply, ERISA covered the plan in question despite the improper transactions. *Id.* at 638-39. The Seventh Circuit concluded, "[V]iolations of ERISA do not make ERISA inapplicable, as the Bank believes; if extensive violations of a federal law made that law go away, the rules would be chimerical. ERISA applied, and was violated; for purposes of *Patterson*, what matters is the

application of ERISA's subchapter I, rather than observance of its rules." *Id*. at 640.

Relying primarily on *In re Baker*, we reached the same conclusion in *In re Sewell*, 180 F.3d 707 (5th Cir. 1999). In that case, a bankruptcy trustee appealed the bankruptcy court's ruling, affirmed by the district court, that the debtor's beneficial interest in her employer's ERISA retirement plan should be excluded from the property of the estate despite the fact that certain "prohibited transactions" by the employer or individuals acting for it had caused the plan not to be tax qualified. *Id*. at 708-09. The lower courts rejected the trustee's contention that to be an "ERISA-qualified pension plan,"[3] and thus excludable from the estate under 11 U.S.C. § 541(c)(2), the plan had to be tax qualified under the Internal Revenue Code. *Id*. at 710. We agreed, concluding that tax qualification is not a prerequisite to ERISA qualification. *Id*. at 709.

We explained in *Sewell* that the "provisions in Title 29 of the U.S. Code identify the various types of ERISA plans and specify what must be included in such plans," while the "provisions in Title 26 specify what must be included in an ERISA plan for it to be 'qualified' for tax purposes and thus be subject to special tax provisions that entitle the plan's sponsors and participants to tax benefits provided under ERISA." *Id*. at 710. Thus, "ERISA is a largely parallel, dual system, jointly administered by the Department of Labor and the Department of the Treasury, and statutorily bifurcated into Titles 26 and 29 of the U.S. Code" and "many provisions and requirements found in Title 29 are replicated in Title 26." *Id*. "Nowhere in ERISA, however, is there a requirement that, to be an ERISA plan and thus be governed by ERISA, a plan must be tax

---

[3] Like the Seventh Circuit in *Baker*, we noted in *Sewell* that the Supreme Court coined the phrase "ERISA-qualified pension plan" in its opinion in *Patterson v. Shumate*, 504 U.S. 753 (1992), and that the term appears nowhere in ERISA's statutory language, is not a term of art, and is not a defined term. *Sewell*, 180 F.3d at 711; *Baker*, 114 F.3d at 638 (noting that "[t]he term does not appear in the statute, and its provenance is mysterious").

qualified." *Id.* at 711. "Indeed, the converse is true: An ERISA plan that is not or may not be tax qualified nevertheless continues to be governed by ERISA for essentially every other purpose." *Id.* As we explained, "It would be perverse, indeed, if the negligent or intentional act of an ERISA plan sponsor, administrator, or other fiduciary, that results in disqualification for tax purposes could, *ipso facto*, remove the plan—and thus the beneficial interests of the employees/participants—from the aegis of ERISA and its protections of the very interests for which the legislation was adopted and is administered in parallel by the Treasury and Labor Departments." *Id.* Thus, the failure of an ERISA plan to remain tax qualified does not mean that the plan is no longer "ERISA-qualified."

The district court concluded that Ralston planned "to testify that the ERISA plan in question was not tax qualified" and that this testimony was "irrelevant and should be excluded under either FRE 402 or 403." Wofford appears to take issue with, but does not directly refute, the district court's characterization of Ralston's proposed testimony as being that the "ERISA plan in question was not tax qualified" and implies that Ralston would have testified more generally that the Plan was not ERISA-qualified. However, a close look at the memo summarizing Ralston's opinions and proposed testimony and the briefing on the motion to strike indicates that Ralston's opinion testimony was limited to whether the Plan remained tax qualified, as the district court concluded.

Ralston did not purport to testify that the Plan was not "ERISA-qualified" or subject to Title I of ERISA when it was created. He did not propose to testify that, before the activities at issue, the Plan had terminated such that Title I protections no longer applied. *See United States v. Hook*, 195 F.3d 299, 307 (7th Cir. 1999) (holding that "[u]ntil an employee-benefit plan has been terminated, the duties and protections of Title I continue to apply to the plan"). Nor did he

opine that the Plan had ceased being an ERISA plan other than by its failure to remain tax qualified. *See, e.g.*, *In re Lowenschuss*, 171 F.3d 673, 681-82 (9th Cir. 1999) (holding that a plan that ceases to have any employee participation is not subject to Title I).

Instead, Ralston's proposed testimony was essentially that: (1) Premier Consulting established the Plan in 1995 and amended it in 1997; (2) no amendments had been made since the 1997 amendment; (3) legislation enacted by Congress and commonly referred to by the acronym "GUST" significantly changed the requirements that must be satisfied for an employee pension benefit plan to constitute a qualified plan under Section 401(a) of the Code; (4) Premier never made any amendments to incorporate and comply with the GUST requirements; (5) "[b]ecause these amendments were not made to the Plan, the Plan does not meet the requirements of Section 401(a) of the Code and is not a qualified employee pension benefit plan." Under *Baker* and *Sewell*, however, the fact that the Plan fails to remain tax qualified under the Internal Revenue Code does not mean that it is no longer subject to any provision of Title I of ERISA.[4] Thus, the district court correctly concluded that Ralston's testimony, to the extent it dealt with whether the Plan had ceased to be tax qualified or otherwise failed to comply with the Internal Revenue Code, was irrelevant to the issue of whether the Plan was subject to any provision of Title I of ERISA. Further, to the extent Ralston planned to testify that the Plan was no longer "ERISA-qualified" due to being out of compliance with the Internal Revenue Code requirements, this testimony was legally incorrect under *Baker* and *Sewell*,

---

[4] *See also United States v. Jewell*, 538 F. Supp. 2d 1087, 1093 (E.D. Ark. 2008) (rejecting the Government's argument in a forfeiture case that the defendant had to show that the plans were operated in conformity with § 401(a) of the IRC before he could obtain the protection of ERISA's anti-alienation provision, § 1056(d)(1), noting that this confused "the requirements of ERISA with the prerequisites for achieving tax qualification for an ERISA plan").

and therefore was properly excluded. *Hook*, 195 F.3d at 309 (holding that expert opinion that plan was no longer an ERISA plan for purposes of § 664 was inaccurate as a matter of law and thus properly excluded).

**B.**

Wofford also argues that the district court erred in including the "additional instruction" related to the first element in the jury charge. Because Wofford did not object to the inclusion of the additional instruction in the district court, we apply a plain error standard of review. *See United States v. Ricardo*, 472 F.3d 277, 285 (5th Cir. 2006); *United States v. Maceo*, 947 F.2d 1191, 1198 (5th Cir. 1991). Under the plain-error standard, this Court makes three initial determinations: (1) whether the district court committed error; (2) whether the error is "clear and obvious"; and (3) whether the error affects substantial rights. *United States v. Stevens*, 487 F.3d 232, 242 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 336 (2007). "If these three conditions are satisfied, we have discretion to reverse the district court if we conclude that the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

Wofford argues that the instruction should not have been given because it was requested only in anticipation of Ralston's testimony. Because Ralston's testimony was excluded, Wofford contends, no factual basis existed for the instruction. Though it was the possibility of Ralston's testimony at trial that initially prompted the Government to request the additional instruction, the evidence introduced at trial nevertheless warranted its submission. For example, on cross-examination by defense counsel, witness Angela Sampson testified about an IRS determination letter on the Plan, which stated, "Continued qualification of the plan under its present form will depend on its effect and operation." Sampson was also questioned about a March 11, 2002 letter, sent from the Pension Companies to Premier Consulting, that stated, "On

numerous occasions via numerous media, the Pension Companies conveyed to you and other members of your staff at Premier Consulting that there were items that might very possibly be disqualification issues in the above-mentioned plan." Defense counsel then asked Sampson whether it was "possible that a plan can operate in such a way or fail to operate in such a way that it is not a qualified plan either under the tax code or ERISA." He then stated, "you have said your experience has been that it happens that some plans are operated in such a way that they cease being a tax qualified plan and they cease being an ERISA plan. Have I got that right?" Because defense counsel raised the issue of whether the Plan's failure to remain tax qualified caused it to cease being an ERISA plan, submission of the additional instruction, which correctly stated the law, was not error, plain or otherwise.

## C.

Wofford further argues that the combination of the district court's exclusion of his expert witness and the inclusion of the "additional instruction" was constitutional error insofar as it deprived him of the right to have a jury determine his guilt on every element of the crime charged, in violation of *United States v. Gaudin*, 515 U.S. 506 (1995). We have already determined that the district court's exclusion of the expert witness and inclusion of the "additional instruction" were not error. Even if erroneous, however, they did not deny Wofford his right to have the jury determine whether the Plan was subject to Title I of ERISA.

In *Gaudin*, the Supreme Court reiterated that the Fifth and Sixth Amendments require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged. *Gaudin*, 515 U.S. at 509-10. The Court further noted that "the application-of-legal-standard-to-fact sort of question," commonly called a "mixed question of law and fact" has typically been resolved by juries, and that

defendants have a constitutionally guaranteed right to demand that the jury decide guilt or innocence on every issue, including application of the law to the facts. *Id.* at 512-13. In *Gaudin*, the district court violated this right by refusing to submit the question of "materiality" to the jury when that was an element of the crime of making material false statements in a matter within the jurisdiction of a federal agency. The district court instructed the jury that the statements charged in the indictment were material statements. *Id.* at 508. *Gaudin* is easily distinguishable on its facts, as the district court in this case did not instruct the jury that the Plan was subject to Title I of ERISA. Rather, the district court plainly left that issue for the jury to decide by applying the law as set forth in the charge to the facts at trial.

Further, the *Gaudin* Court reiterated that, in criminal cases, as in civil, the judge "must be permitted to instruct the jury on the law and to insist that the jury follow his instructions." *Id.* at 513 (citing *Sparf v. United States*, 156 U.S. 51, 105-06 (1895)). The "additional instruction" was a correct instruction on the law, was warranted by the evidence, and was intended to guide the jury in making its application-of-legal-standard-to-fact determination. Accordingly, the district court properly required the jury to determine the factual issue of whether, in light of the law as set forth in the charge, the Plan was subject to any provision of Title I of ERISA. The district court did not commit constitutional error.

## III.

Wofford next challenges the district court's inclusion of a deliberate ignorance instruction in the jury charge. Wofford does not argue that the instruction was incorrect; he argues only that its submission was not warranted by the evidence presented at trial. Because Wofford did not raise this objection in the district court, we review for plain error.

The term "deliberate ignorance" "denotes a conscious effort to avoid positive knowledge of a fact which is an element of an offense charged, the defendant choosing to remain ignorant so he can plead lack of positive knowledge in the event he should be caught." *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990). "The purpose of the deliberate ignorance instruction is to inform the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." *United States v. Wells*, 262 F.3d 455, 465 (5th Cir. 2001). Where the *mens rea* required for conviction is that the defendant act "knowingly" or "willfully," a deliberate ignorance instruction creates a risk that the jury might convict for negligence or stupidity, *i.e.*, that the defendant should have been aware of the illegal conduct. *United States v. Cartwright*, 6 F.3d 294, 301 (5th Cir. 1993). Thus, it should only be given when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate ignorance. *Wells*, 262 F.3d at 465. If the defendant claims a lack of guilty knowledge, "[t]he instruction is proper where the evidence shows (1) subjective awareness of a high probability of the existence of illegal conduct, and (2) purposeful contrivance to avoid learning of the illegal conduct." *Id.* (citing *United States v. Threadgill*, 172 F.3d 357, 368 (5th Cir. 1999)). In reviewing whether an instruction was supported by the evidence, "we view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the Government." *United States v. Nguyen*, 493 F.3d 613, 619 (5th Cir. 2007). We have consistently upheld deliberate ignorance instructions so long as they have the required factual basis. *United States v. Moreno*, 185 F.3d 465, 476 (5th Cir. 1999).

In *United States v. Wisenbaker*, 14 F.3d 1022, 1027 (5th Cir. 1994), this Court found no error in the submission of a deliberate ignorance instruction in a tax evasion case where the defendant did not testify, but the core of his defense was that he lacked the necessary willful mental state. His attorney's opening

18

statement centered on the defendant's mental state defense and a witness testified as to the defendant's belief that he was not responsible for the taxes. As in *Wisenbaker*, even though Wofford did not testify, he did raise a lack of guilty knowledge through his counsel's opening and closing statements, which emphasized a lack of guilty knowledge and the presence of good faith, and through the testimony of Patricia Dimmitt, who testified that Wofford told her that he believed his actions were authorized.

The next inquiry is thus whether the evidence at trial raised an inference that Wofford was subjectively aware of a high probability of the existence of illegal conduct. This prong "protects a defendant from being convicted for what he should have known" and permits a deliberate ignorance instruction only when the Government presents facts that support an inference that the particular defendant subjectively knew his act to be illegal and not when the Government presents facts that tend to support an inference that a reasonable person would have known the act to be illegal. *Nguyen*, 493 F.3d at 619 (citing *Lara-Velasquez*, 919 F.2d at 952). The defendant may not be convicted simply because he was foolish, stupid, or negligent. *Lara-Velasquez*, 919 F.2d at 952. Suspicious behavior may be sufficient to infer subjective awareness of illegal conduct. *Nguyen*, 493 F.3d at 620.

There was sufficient evidence at trial to raise an inference that Wofford was subjectively aware of a high probability that his conduct was illegal. There was evidence that Wofford changed his story regarding why he believed his conduct was justified. Willie Byrd, a DOL investigator, testified that Wofford told him at an initial interview that Bill Erickson of the Pension Companies said that the money was a forfeiture and that he could do anything he wanted with it. Erickson denied making this statement. At trial, however, Wofford's defense was that he believed these loans were permissible investments. False or inconsistent statements have been held to support an inference that the

19

defendant was subjectively aware of a high degree of probability of illegal conduct because it gives a glimpse into the defendant's state of mind. *Lara-Velasquez*, 919 F.2d at 953.

Further, the testimony of Glen Swan, the government auditor, indicated that Wofford concealed the progression of the money for most of the loans. For the first few loans, the initial "loan" was placed into the ASCI ESOP and then transferred into the ASCI operating account. Other "loans" to ASCI were then transferred via check to Wofford and subsequently deposited into his personal accounts. This suspicious movement of the funds supports an inference of subjective knowledge that the conduct was likely illegal.

The second prong, whether the evidence at trial raises the inference that the defendant purposefully contrived to avoid learning of the illegal conduct, can be reached only if the first prong has been established. *Id*. A defendant's purposeful contrivance to avoid guilty knowledge may be established by direct or circumstantial evidence.

The evidence at trial supports an inference that Wofford purposefully contrived to avoid learning that his conduct was illegal. Witness Peggy Boyanton testified that she and Patricia Dimmitt asked Wofford, "Don't you think this might be illegal?" Wofford failed to investigate after Boyanton raised these concerns. *See Wisenbaker*, 14 F.3d at 1027-28 (noting that the evidence plainly supported an inference of deliberate ignorance when the defendant chose not to file excise tax returns even after his bookkeepers brought to his attention his duty to do so). Further, the evidence at trial was that Wofford, a CPA, had read the Plan documents, and those documents stated that the funds were to be used only for the exclusive benefit of participants and referenced the Internal Revenue Code and ERISA. Thus, the evidence also supports an inference that Wofford knew that the Plan and ERISA imposed certain limitations on him, but

he deliberately chose not to determine whether his actions complied with those limitations.

Because the evidence supported the deliberate ignorance instruction, the district court did not plainly err in including the instruction. Even if it was error, however, it was harmless. Any error in submitting the instruction is subject to harmless error review. *Nguyen*, 493 F.3d at 619. "We have consistently held that an 'error in giving the deliberate ignorance instruction is ... harmless where there is substantial evidence of actual knowledge.'" *Threadgill*, 172 F.3d at 369 (quoting *United States v. Cartwright*, 6 F.3d 294, 301 (5th Cir.1993)).

The evidence supporting the inference that Wofford was subjectively aware that his conduct was unauthorized and illegal also supports the inference that he had actual knowledge. Because there is substantial evidence of actual knowledge, any error in submitting the deliberate ignorance instruction was harmless. *Threadgill*, 172 F.3d at 369.

## IV.

We AFFIRM the judgment of the district court.